**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
―――――――――――――――――――――――――――x

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

    **-v-**                                              Case No. 18 Cr. 603 (ARR)

**ABDI YUSUF HASSAN,**

        **Defendant.**
―――――――――――――――――――――――――――x

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT ABDI YUSUF HASSAN'S MOTION TO INTRODUCE
# EXPERT EYEWITNESS IDENTIFICATION TESTIMONY

James Kousouros, Esq.
Eric Grossfeld, Esq.
Law Offices of James Kousouros
260 Madison Avenue, 22nd Floor
New York, New York 10016
Phone: (212) 532-1934
Fax: (212) 532-1939

*Attorneys for Abdi Yusuf Hassan*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii
I. PRELIMINARY STATEMENT ........................................................................................ 1
II. RELEVANT FACTUAL BACKGROUND ....................................................................... 2
III. DR. FRANKLIN'S PROPOSED TESTIMONY ................................................................ 3
IV. THE COURT SHOULD GRANT THE MR. HASSAN'S MOTION TO INTRODUCE DR. FRANKLIN'S TESTIMONY ..................................................................... 5
   A. Applicable Law ............................................................................................................ 5
   B. Discussion .................................................................................................................... 7
      1. Contrary to jurors' "commonsense understandings," eyewitness identification is unreliable. ............................................................................................................ 7
      2. The Second Circuit's decision in *Nolan*, in affirming the importance of eyewitness expert testimony and the science behind it, underscores the need for Dr. Franklin's expert testimony. ..................................................................................................... 9
      3. Dr. Franklin's testimony is reliable and relevant to the Court's consideration of identification suppression and to the jury's consideration of Mr. Moore's identification testimony. ............................................................................................ 11
V. CONCLUSION ................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ........................ 5

*Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) ................................................................................. 12

*California v. Trombetta*, 467 U.S. 479 (1984)............................................................................. 13

*Campbell v. Metro. Prop. and Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001).................................... 5

*Crane v. Kentucky*, 476 U.S. 683 (1986) ..................................................................................... 13

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ......................................................... 5, 6, 12

*Jarrett v. Headley*, 802 F.2d 34 (2d Cir. 1986).............................................................................. 3

*Kampshoff v. Smith*, 698 F.2d 581 (2d Cir. 1983) ..................................................................... 7, 8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................... 5

*Lyons v. Johnson*, 99 F.3d 499 (2d Cir. 1996), *as amended* (Nov. 14, 1996) ................................ 7

*People v. Abney*, 932 N.Y.S.2d 762, 2011 WL 2026894 (Sup. Ct. 2011).................................... 11

*People v. McCullough*, 5 N.Y.S.3d 665 (N.Y. App. Div. 2015), *rev'd on other grounds,* 27 N.Y.3d 1158 (2016) ................................................................................................................... 12

*People v. Norstrand*, 939 N.Y.S.2d 261 (Sup. Ct. 2011).............................................................. 11

*Perry v. New Hampshire*, 565 U.S. 228 (2012)....................................................................... 8, 11

*Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001) .............................................................................. 7

*Salem v. U.S. Lines Co.*, 370 U.S. 31 (1962)................................................................................. 6

*State v. Henderson*, 27 A.3d 827 (N.J. 2011) ........................................................................... 9, 10

*State v. Lawson*, 291 P.3d 673 (Or. 2012) .................................................................................. 10

*United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984) .............................................................. 3

*United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009) ................................................................. 8

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)............................................................. 6

*United States v. Brownlee,* 454 F.3d 131 (3d Cir. 2006) .......................................................... 6, 7, 8

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004).......................................................................... 5

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985).................................................................. 6

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)......................................................................... 6

*United States v. Harris*, 995 F.2d 532 (4th Cir. 1993)...................................................................... 6

*United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980), *cert. denied,* 447 U.S. 928 (1980) ......... 3

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................................ 6, 12

*United States v. Nolan*, 956 F.3d 71(2d Cir. 2020)............................................................. 9, 10, 12

*United States v. Smith*, 156 F.3d 1046 (10th Cir. 1998) ................................................................... 6

*United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000) ................................................................. 9

*United States v. Wade*, 288 U.S. 218 (1967) ................................................................................ 7, 8

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ................................................................................ 8

**Rules**

Fed. R. Evid. 702 ........................................................................................................................ 1, 6

**Other Authorities**

Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J. L. & Psychiatry 265 (2004) ................................. 9

Elin M. Skagerberg, *Co-Witness Feedback in Line-Ups*, 21 Applied Cognitive Psychol. 489 (2007) ............................................................................................................................................. 9

Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. Experimental Psychol.: Applied 139 (2008) ........ 9

Memorandum for Heads of Department Law Enforcement Components, from Sally Q. Yates, Deputy Attorney General, *Subject: Eyewitness Identification: Procedures for Conducting Photo Arrays* .................................................................................................................................... 3

NATIONAL RESEARCH COUNCIL, *Identifying the Culprit: Assessing Eyewitness Identification* (2014) ............................................................................................................................................. 9

Stephanie J. Platz & Harmon M. Hosch, *Cross-Racial/Ethnic Eyewitness Identification: A Field Study*, 18 J. Applied Soc. Psychol. 972 (1988) ............................................................................ 9

THE INNOCENCE PROJECT, *Eyewitness Identification Reform* ........................................................... 7

# EXHIBITS

**Exhibit A:**     Moore Dec. 14, 2014 302

**Exhibit B:**     3501-19

**Exhibit C:**     3501-20

**Exhibit D:**     Moore Jan. 25, 2019 302

**Exhibit E:**     USAO_HASSAN_0055

**Exhibit F:**     Affidavit of Dr. Nancy Franklin

**Exhibit G:**      Dr. Nancy J. Franklin Curriculum Vitae

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────x

UNITED STATES OF AMERICA,

        Plaintiff,

        -v-                                       Case No. 18 Cr. 603 (ARR)

ABDI YUSUF HASSAN,

        Defendant.
───────────────────────────────x

## I.    PRELIMINARY STATEMENT

Defendant Abdi Yusuf Hassan respectfully moves, pursuant to Rule 702 of the Federal Rules of Evidence, to introduce the testimony of Dr. Nancy Franklin, an expert in eyewitness memory and identification. Mr. Hassan seeks to introduce Dr. Franklin's testimony at a pretrial hearing concerning Michael Scott Moore's purported identification of Mr. Hassan (*see* ECF No. 41 ("The issues regarding the identification will be addressed on the eve of trial.")), and at trial.[1] In light of the inherent unreliability of eyewitness identification and the credibility issues surrounding Mr. Moore's identification of Mr. Hassan, Dr. Franklin's testimony is necessary for both the Court's assessment of whether to suppress Mr. Moore's identification testimony and the jury's evaluation of the credibility of Mr. Moore's identification testimony.

---

[1] Dr. Franklin's proposed testimony is necessarily limited to the factual record as it presently exists. Because a full factual record concerning Mr. Moore's non-identification of Mr. Hassan in 2014, his purported identification of Mr. Hassan in 2019, and any intervening events during that five-year-period has yet to be adduced at a pretrial hearing, Mr. Hassan respectfully requests the opportunity to supplement Dr. Franklin's testimony based on facts elicited and questions answered during a pretrial hearing. Mr. Hassan thus respectfully renews his request that Mr. Moore testify at this hearing in order to facilitate critically necessary fact-finding. Such testimony is indispensable: Only Mr. Moore can testify as to the conditions of his captivity, his alleged interactions with ▮▮▮▮▮▮▮▮ to whom he refers and the conditions surrounding these alleged interactions, his non-identification of Mr. Hassan during his debriefing, any post-captivity suggestiveness, and the circumstances surrounding the January 2019 identification procedure. As additional facts are developed at a hearing on this identification, the need for expert testimony will manifestly increase.

1

## II.     RELEVANT FACTUAL BACKGROUND

On or about January 21, 2012, Michael Scott Moore, a freelance journalist, was violently abducted in Galkayo, Somalia. For over two-and-a-half years, he was held captive in Somalia, while his armed captors made ransom demands to his family. During this time, Mr. Moore was allegedly beaten and forced to make calls to his family and proof of life videos designed to secure his ransom. Throughout his captivity, Mr. Moore was allegedly held at gunpoint around-the-clock and was at times in the presence of, and possibly threatened with, military weapons such as missile launchers and assorted assault rifles. He was allegedly shackled and transported to various remote locations throughout his captivity. Mr. Moore's glasses were allegedly destroyed at the onset of his captivity.

In or about September 2014, Mr. Moore was released after a ransom had been paid. Subsequent to his release, Mr. Moore was debriefed extensively by law enforcement during which he detailed his time in captivity.

[redacted]

---

[2] The Government disclosed the 3500 Material discussed herein on March 10, 2020. These and other materials will be filed under seal as they are subject to a protective order.

2

On January 25, 2019, during a meeting on Skype, agents showed Mr. Moore a six-pack of photographs which included a photograph of Mr. Hassan. *See* Exhibit D; USAO_HASSAN_0055, Exhibit E. Mr. Moore purportedly "positively identified" the third photograph as that of Mr. Hassan, referring to Mr. Hassan as "Hassan" and describing him as a "runner" and translator for Mr. Moore's guards. Exhibit D. This identification procedure was conducted with the agent who would later swear to the initial complaint filed against Mr. Hassan on January 29, 2019 and, accordingly, in contravention of the Justice Department's recommended procedures.³ Further complicating the integrity of this procedure is the fact that Mr. Hassan was literally "framed" in the photo-array: his photograph – and *only* his photograph – has a border surrounding it. *See id*.⁴

### III. DR. FRANKLIN'S PROPOSED TESTIMONY

Dr. Franklin has prepared an affidavit outlining her proposed testimony, which is incorporated herein by reference. *See* Affidavit of Dr. Nancy Franklin ("Franklin Aff."), Exhibit F. In brief, Dr. Franklin will testify as to the following factors that "increase the risk of both memory errors and mistaken identifications" and may be present here: "Face identification as a function of familiarity"; "Opportunity to view"; "Event stress"; "Weapon presence"; "Multiple

---

³ On its face, this "non-blinded" procedure seemingly violates the spirit of the Department of Justice's recommended procedures for conducting photo arrays, which were promulgated in 2017 to account for the significant evolution of "[r]esearch and practice" since the Department of Justice had last assessed procedures for photo arrays in 1999. *See* Memorandum for Heads of Department Law Enforcement Components, from Sally Q. Yates, Deputy Attorney General, *Subject: Eyewitness Identification: Procedures for Conducting Photo Arrays*, at ¶ 5.1 (Jan. 6, 2017), available at https://www.justice.gov/file/923201/download ("The administrator must ensure that he or she does not suggest to the witness – even unintentionally – which photograph contains the image of the suspect. Oftentimes, the best and simplest way to achieve this is by selecting an administrator who is not involved in the investigation and does not know what the subject looks like."). Notwithstanding the memorandum's disclaimer that "[n]othing in these procedures implies that an identification not done in accordance with them is unreliable or inadmissible in court," *id*. at 2, Dr. Franklin is prepared to testify in detail as to the inherent unreliability of the procedure employed in this case. *See* Section III, *infra*.

⁴ Consequentially, it is possible that Mr. Hassan's photograph "so stood out from all of the other photographs as to 'suggest to an identifying witness that [he] was more likely to be the culprit.'" *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)). Reviewing a circumstance less egregious than here, the Second Circuit thought "it would have been preferable" for a district court to "conduct[] a pretrial hearing" on the issue of suggestiveness. *Archibald*, 734 F.2d at 941 (citing *United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir. 1980), *cert. denied*, 447 U.S. 928 (1980)).

persons"; "Cross-race identification"; "Partial disguise"; "Characteristics of the description"; "'Trained observers'"; "Post-event suggestion"; "Delay"; "ID administrators' knowledge of who the suspect is (*Non-blind procedures*)"; "Probative value of both non-identifications and filler identifications"; "Exposure effects"; "Confidence"; and "In-court identifications as comparable to highly suggestive showup procedures." Franklin Aff. at ¶ 7. Dr. Franklin will also address the import of the non-identification of Mr. Hassan in the immediate aftermath of Mr. Moore's last alleged interaction with Mr. Hassan and his purported "positive" identification of Mr. Hassan nearly five years later.

Dr. Franklin shares Mr. Hassan's view that "questions remain unanswered" surrounding Mr. Moore's non-identification and purported identification of Mr. Hassan, including: "[1] What degree of visual familiarity did Mr. Moore develop during his captivity with the man alleged to be Mr. Hassan? [2] Under what circumstances did he view and reject the photographs of Mr. Hassan in 2014? [3] What post-event information was Mr. Moore exposed to, both before and after his January 2019 photo array identification of Mr. Hassan?" *Id*. at ¶ 69.

"Even in the absence of these details," however, Dr. Franklin concludes that materials presently available "point strongly toward the unreliability of Mr. Moore's identification of Mr. Hassan. The circumstances in which Mr. Moore encountered his captor were far from optimal for forming a rich and lasting memory for the captor's face. His initial and definitive rejection of Mr. Hassan's photo is the identification decision we should rely on, and it becomes even more probative of innocence if Mr. Moore had indeed developed a clear and lasting memory for his captor's face over multiple personal interactions. The ultimate identification of Mr. Hassan, which took place after memory for the captor's face would have been expected to have largely decayed, occurred only after exposure to multiple suggestive influences. In sum, the evolution of Mr.

4

Moore's identification decisions regarding Mr. Hassan points toward the unreliability of his eventual identification, as does the rather diverse collection of faces that Mr. Moore associated with the same captor." *Id*. at ¶ 70.

### IV.    THE COURT SHOULD GRANT MR. HASSAN'S MOTION TO INTRODUCE DR. FRANKLIN'S TESTIMONY

#### A.  Applicable Law

"The Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993)). "In order to fulfill these gatekeeping functions, the district court must 'analyz[e] whether [the] proffered expert testimony is relevant, i.e. whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id*. (quoting *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)) (brackets in original). "The court must also evaluate 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" *Id*. (quoting *Campbell v. Metro. Prop. and Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)); *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) ("We conclude that *Daubert*'s general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.' It 'requires a valid ... connection to the pertinent inquiry as a precondition to admissibility.' And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (internal citations omitted; quoting *Daubert*, 509 U.S. at 590, 592).

"A decision to exclude expert testimony rests soundly with the discretion of the trial court and shall be sustained unless 'manifestly erroneous.'" *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)). "Generally, the use of expert testimony is not permitted if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Federal courts uniformly analyze the admissibility of expert testimony regarding eyewitness identification under *Daubert* and Rule 702. *See, e.g.*, *United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006) (finding the district court erred in excluding expert testimony concerning the "confidence-accuracy correlation" with respect to eyewitness identifications following a *Daubert* hearing); *id.* ("Due to the nature of the Government's evidence and Brownlee's defense (mistaken identity), the primary issue before the jury was the reliability of the Government's four eyewitnesses. '[I]t would seem anomalous to hold that the probative value of expert opinion offered to show the unreliability of eyewitness testimony so wastes time or confuses the issue that it cannot be considered even when the putative effect is to vitiate the [primary] evidence offered by the government.'") (quoting *United States v. Downing*, 753 F.2d 1224, 1243 (3d Cir. 1985)); *United States v. Smith*, 156 F.3d 1046, 1054 (10th Cir. 1998) (determining admissibility of expert testimony on eyewitness identification under *Daubert* and noting that "we agree that expert testimony on eyewitness identification may properly be admitted under *Daubert* in certain circumstances"); *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993) (setting forth factors that favor the admission of expert testimony regarding eyewitness identifications under

Rule 702, including, as relevant here, "cross-racial identification" and "identification after a long delay").

    B. Discussion

        **1. Contrary to jurors' "commonsense understandings," eyewitness identification is unreliable.**

"The issue of misidentification is absolutely fundamental to a criminal trial." *Lyons v. Johnson*, 99 F.3d 499, 504 (2d Cir. 1996), *as amended* (Nov. 14, 1996). "When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).

"There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial. Juries, naturally desirous to punish a vicious crime, may well be unschooled in the effects that the subtle compound of suggestion, anxiety, and forgetfulness in the face of the need to recall often has on witnesses. Accordingly, doubts over the strength of the evidence of a defendant's guilt may be resolved on the basis of the eyewitness' seeming certainty when he points to the defendant and exclaims with conviction that veils all doubt, '[T]hat's the man!'" *Kampshoff v. Smith*, 698 F.2d 581, 585 (2d Cir. 1983) (quoting *United States v. Wade*, 288 U.S. 218, 235-36 (1967)).

Most troubling, the persuasiveness of an eyewitness identification is matched by its frequent lack of reliability: such evidence is increasingly considered to be "among the least reliable forms of evidence." *Brownlee,* 454 F.3d at 142 (citation omitted); *see also* THE INNOCENCE PROJECT, *Eyewitness Identification Reform*, at https://www.innocenceproject.org/eyewitness-identification-reform (describing mistaken eyewitness identifications contributing to wrongful convictions).

"Even more problematic, jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable. Thus, while science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors' commonsense understandings." *Brownlee*, 454 F.3d at 142 (citations and quotations omitted); *see Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) ("We do not doubt either the importance or the fallibility of eyewitness identifications. Indeed, in recognizing that defendants have a constitutional right to counsel at postindictment police lineups, we observed that 'the annals of criminal law are rife with instances of mistaken identification.'") (quoting *Wade*, 388 U.S. at 228); *id.* (referencing studies showing that eyewitness misidentifications are the leading cause of wrongful convictions and research reflecting high incidence of misidentification); *id.* at *Young v. Conway*, 698 F.3d 69, 78-79 (2d Cir. 2012) ("[Scientific] literature indicates that certain circumstances surrounding a crime – including the perpetrator's wearing a disguise, the presence of a weapon, the stress of the situation, the cross-racial nature of the crime, the passage of time between observation and identification, and the witness's exposure to defendant through multiple identification procedures – may impair the ability of a witness … to accurately process what she observed. Many of these factors are counterintuitive and, therefore, not coterminous with 'common sense.'"); *Kampshoff*, 698 F.2d at 585 ("[W]hile juries may be led by their experience to believe their eyes, and, by inference, what they hear from those who have seen, the experience of law and psychology has been that witness testimony may sometimes be the least trustworthy means to identify the guilty."); *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) ("[T]he problem with eyewitness testimony is that witnesses who *think* they are identifying the wrongdoer - who are credible because they believe every word they utter on the stand - may be mistaken. Study after study has shown very high error

8

rates in the identification of strangers."); *United States v. Smithers*, 212 F.3d 306, 316 (6th Cir. 2000) ("[T]here is no question that many aspects of perception and memory are not within the common experience of most jurors and in fact, many factors that affect memory are counter-intuitive.").

### 2. The Second Circuit's decision in *Nolan*, in affirming the importance of eyewitness expert testimony and the science behind it, underscores the need for Dr. Franklin's expert testimony.

The Second Circuit has long recognized the potential unreliability of eyewitness identification testimony. Its recent decision in *United States v. Nolan* is no exception – holding from its outset: "Eyewitness identification testimony is notoriously prone to error." 956 F.3d 71, 75 (2d Cir. 2020). However, *Nolan* went further, endorsing "[a] growing body of scientific research"[5] that has "clarified and expanded what factors a court should examine in determining whether to exclude eyewitness identification testimony," *id*. at 80, and holding that counsel "failed to render reasonable professional assistance by neglecting to call or even consult an expert to testify about the unreliability of the eyewitness identifications under the egregious circumstances presented in this case," *id*. at 81.

The court held that the "identifications bore significant indicia of unreliability," *id*. at 75, including, as relevant here, the presence of a weapon at the crime scene, *see id*. at 80 ("[R]esearch has shown that 'an eyewitness under high stress is less likely to make a reliable identification of the perpetrator'") (quoting *State v. Henderson*, 27 A.3d 827, 904 (N.J. 2011)); the cross-racial

---

[5] *See* NATIONAL RESEARCH COUNCIL, *Identifying the Culprit: Assessing Eyewitness Identification* (2014); Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J. L. & Psychiatry 265 (2004); Stephanie J. Platz & Harmon M. Hosch, *Cross-Racial/Ethnic Eyewitness Identification: A Field Study*, 18 J. Applied Soc. Psychol. 972 (1988); Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. Experimental Psychol.: Applied 139 (2008); Elin M. Skagerberg, *Co-Witness Feedback in Line-Ups*, 21 Applied Cognitive Psychol. 489 (2007).

nature of the identifications, *id*. ("It is well established that eyewitnesses are materially less accurate when identifying individuals of a different race…") (citing *Henderson*, 27 A.3d at 907; *State v. Lawson*, 291 P.3d 673, 688 (Or. 2012)); and the duration of time between the crime and the identifications, *id*. ("[I]t is also well established that eyewitness identifications are materially less accurate if made more than a short time after a crime.") (citing *Lawson*, 291 P.3d at 688).

These factors are present here. First, the Government's allegation that Mr. Hassan threatened Mr. Moore with weapons of mass destruction necessarily involves "the widely-recognized phenomenon known as 'weapon focus.'" *Id*.; *see also, e.g.*, Exhibit A at 61 (███████████████████████████████████████████████████████). Second, Mr. Moore is Caucasian, while Mr. Hassan is of African descent. Finally, Mr. Moore's purported identification of Mr. Hassan in 2019 occurred five years after his release – significantly longer than the "many weeks" that passed between the crime and identifications in *Nolan*. *Nolan*, 956 F.3d at 80. This purported identification occurred nearly five years after Mr. Moore could not recognize a strikingly-similar photograph of Mr. Hassan. As set forth in Dr. Franklin's affidavit, this case involves myriad other factors for which expert testimony will be indispensable to a just resolution of the issues presented.

Further, the *Nolan* court noted that "[s]tudies have demonstrated that the memories of eyewitnesses are extremely susceptible to contamination by external information[.]" *Id*. at 81. The court pointed to witnesses "talk[ing] among themselves" and "viewing [Nolan's] photos on Facebook" as "potentially biasing the victims' identifications." *Id*. The extent to which Mr. Moore was similarly "contaminat[ed] by external information" is, as of this moment, unknown. However, several potential instances of post-event exposure have been identified. Mr. Hassan thus seeks to elicit testimony from Mr. Moore during a pretrial hearing to fill in the informational void of the

10

nearly-five-year period between Mr. Moore's nonidentification of Mr. Hassan in 2014 and his purported identification of Mr. Hassan in 2019. *See Perry*, 565 U.S. at 264 (Sotomayor, J., dissenting) ("Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by post-event information or social cues … and that suggestiveness can stem from sources beyond police-orchestrated procedures.").

Based strictly on the limited factual record presently before the Court, however, the circumstances here are no less egregious than those in *Nolan* and, accordingly, sufficiently warrant the admission of Dr. Franklin's testimony.

### 3. Dr. Franklin's testimony is reliable and relevant to the Court's consideration of identification suppression and to the jury's consideration of Mr. Moore's identification testimony.

#### i. *Reliability*

Dr. Franklin's expert qualifications are irrefutable,[6] as affirmed by two New York trial courts that have admitted her expert testimony. *See People v. Norstrand*, 939 N.Y.S.2d 261, 265 (Sup. Ct. 2011) ("Franklin is an expert in her field. She has the requisite scientific background and knowledge to testify as an expert in the field of eyewitness identification"); *People v. Abney*, 932 N.Y.S.2d 762, 2011 WL 2026894, at *8 (Sup. Ct. 2011) ("Dr. Franklin is a long-tenured professor of cognitive psychology, teaches a university course on the subject of the reliability of eyewitness identification, lectures on memory and eyewitness identification, is familiar with the studies, research and articles dealing with each of the four areas about which she intends to testify, has been qualified on numerous other occasions as an expert, and is undeniably an expert in human memory, the very field upon which the criticisms of the reliability of eyewitness identifications are based."). Further, a panel of New York's Appellate Division considered her a "qualified expert

---

[6] *See* Dr. Nancy J. Franklin Curriculum Vitae, Exhibit G, incorporated herein by reference.

11

on eyewitness identification," *People v. McCullough*, 5 N.Y.S.3d 665, 668 (N.Y. App. Div. 2015), *rev'd on other grounds,* 27 N.Y.3d 1158 (2016).

The reliability of Dr. Franklin's assessment – including its science-based underpinning – is similarly undeniable. Indeed, the Second Circuit in *Nolan* explicitly cited with approval *Identifying the Culprit: Assessing Eyewitness Identification*, a source on which Dr. Franklin relies. *See, e.g.*, *Nolan*, 956 F.3d at 80; Franklin Aff. at ¶ 8.

### ii. *Relevancy*

"A witness qualified as an expert typically will be permitted to testify if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Lumpkin*, 192 F.3d at 289 (quoting Fed. R. Evid. 702). "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591.

Dr. Franklin's testimony is patently relevant to the Court's decision to admit Mr. Moore's identification testimony and, if permitted, to the jury's assessment of it. At the threshold, the Court must decide if Mr. Moore's identification of Mr. Hassan is sufficiently reliable to warrant its admission at trial. Dr. Franklin's testimony, based on scientifically-grounded, evidence-based research, will demonstrate why it is not. If Mr. Moore's identification of Mr. Hassan is admitted at trial, Dr. Franklin's testimony will be necessary for the jury in assessing its reliability. *See Nolan*, 956 F.3d at 76 (noting an expert witness "could have informed the judge and jury about the multiple, well-established ways in which [eyewitness] identifications were unreliable"); *id.* at 81 (noting "an expert could have explained that the eyewitness's identification was highly unreasonable for reasons 'beyond the ken of the typical juror'") (quoting *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007)); *id.* at 82 ("A lay juror would not know, for example, about the likely

impact on perception of extreme stress and weapon focus, nor would the juror necessarily understand that the detective's identification practices were highly suggestive.").

## V.     CONCLUSION

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Dr. Franklin's testimony is necessary in order to meaningfully confront Mr. Moore's unreliable, purported identification of Mr. Hassan at both a pretrial hearing and at trial. For the foregoing reasons, Mr. Hassan respectfully requests that the Court grant his motion.

Dated:  May 28, 2020
       New York, New York

Respectfully submitted,

*/s/ James Kousouros*
James Kousouros, Esq.
Eric Grossfeld, Esq.
260 Madison Avenue, 22nd Floor
New York, New York 10016
Phone: (212) 532-1934
Fax: (212) 532-1939

*Attorneys for Abdi Yusuf Hassan*