UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

MOHAMED TAHLIL MOHAMED,
    also known as "Tahlil Mohamed,"
    "Mohamed Tahlil," "Maxamed
    Tahliil Guure," "the Taliye" and
    "Mohamed the Taliye," and
ABDI YUSUF HASSAN,

               Defendants.

**S2 18 Cr. 603 (ARR)**


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT ABDI YUSUF HASSAN'S MOTION TO ADMIT
EXPERT TESTIMONY REGARDING EYEWITNESS IDENTIFICATIONS**


RICHARD P. DONOGHUE
United States Attorney for the
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

David W. Denton, Jr.
Sam Adelsberg
Special Assistant United States Attorneys
    *Of Counsel*

## Table of Contents

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ...................................................................................................... 2

   I.    HASSAN'S ROLE IN THE HOSTAGE-TAKING CONSPIRACY ....................... 2

   II.    MOORE'S REVIEW OF PHOTOGRAPHS OF HASSAN .................................... 5

   III.    ADDITIONAL EVIDENCE OF HASSAN'S PARTICIPATION IN THE
     HOSTAGE-TAKING ...................................................................................... 6

ARGUMENT ........................................................................................................... 7

   I.    THE COURT SHOULD PRECLUDE THE TESTIMONY OF DR. FRANKLIN
     BECAUSE IT IS NOT PROPERLY THE SUBJECT OF EXPERT TESTIMONY. ..... 7

     A.    Applicable Law .................................................................................. 7

     B.    Discussion ........................................................................................ 11

         1.    Dr. Franklin's Testimony Will Not Assist the Court With the Pretrial Question
          of Admissibility of Moore's Identification of Hassan ............................................ 11

         2.    Dr. Franklin's Testimony Is Inadmissible at Trial ........................................... 15

             a.   Most of Dr. Franklin's Assessment Is Irrelevant Because Critical
               Information Was Withheld from Her ....................................................... 15

             b.   The Affidavit Merely Recites Factors that Courts Have Recognized to be
               Within "Common Knowledge" ............................................................. 18

             c.   The Affidavit Exceeds the Permissible Scope of Expert Testimony ......... 21

             d.   Hassan Can Properly Address Identification Evidence Through Cross-
               Examination .................................................................................... 23

   II.  IN THE ALTERNATIVE, THE COURT SHOULD HOLD A *DAUBERT* HEARING 25

CONCLUSION .................................................................................................. 29

## TABLE OF AUTHORITIES

**Federal Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ............................ 26, 28

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)............................... 8, 10, 25

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ............................................... 7, 25

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999) ......................................... 26, 27

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ...................................................... 11

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ......................................................... 10

*Salem v. U.S. Lines Co.*, 370 U.S. 31 (1962) .................................................. 8, 11, 18

*United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973) ........................................... 10

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) .............................................. 18

*United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984) .......................................... 14

*United States v. Bautista*, 23 F.3d 726 (2d Cir. 1994) ............................................ 14

*United States v. Berganza,* 2005 WL 372045 (S.D.N.Y. 2005) ....................................... 12

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)....................................... 8, 22

*United States v. Burrous*, 934 F. Supp. 525 (E.D.N.Y. 1996) ...................................... 24

*United States v. Carter*, 410 F.3d 942 (7th Cir. 2005)............................................ 10

*United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (*en banc*) .................................. 9

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)................................................ 8

*United States v. Gerena*, 116 F.R.D. 596 (D. Conn. 1987) ......................................... 28

*United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999) ......................................... 22, 23

*United States v. Harris*, 995 F.2d 532 (4th Cir. 1993)............................................ 19

*United States v. Jacques Dessange, Inc.*, 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) ................. 9

*United States v. Langan*, 263 F.3d 613 (6th Cir. 2001) ........................................... 19

*United States v. Luis*, 835 F.2d 37 (2d Cir. 1987) ................................................ 9

*United States v. Lumpkin,* 192 F.3d 280 (2d Cir. 1999) ...................................... 1, 8, 22

*United States v. Mahaffy*, 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) .................................... 28

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2nd Cir. 1990) ....................................... 11, 12

*United States v. Mohamed*, 157 F. Supp. 3d 268 (E.D.N.Y. 2016) ................................ 1, 9, 11, 18

*United States v. Nickelous*, 916 F.3d 721 (8th Cir. 2019) .......................................... 23

*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020) ....................................................... 19, 20

*United States v. Padilla*, 1994 WL 681812 (S.D.N.Y. 1994) ...................................... 15

*United States v. Rincon*, 28 F.3d 921 (9th Cir. 1994) ....................................................... 10

*United States v. Rodríguez-Berríos*, 573 F.3d 55 (1st Cir. 2009) ......................................... 10, 24

*United States v. Romano*, 794 F.3d 317 (2d Cir. 2015) ......................................................... 25

*United States v. Ruggiero*, 824 F. Supp. 379 (S.D.N.Y. 1993) ................................................ 11

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) .......................................................... 12

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) .......................................................... 7

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) ......................................................... 11, 21

*United States v. Serna*, 799 F.2d 842 (2d Cir. 1986) ............................................................. 9

*United States v. Shaffer*, 12 Cr. 430 (ARR) ....................................................................... 13, 24

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1991) ....................................................... 12, 13

*United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991) ............................................... 24

*United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982) ................................................... 10

*United States v. Veal*, 182 F.3d 902 (2d Cir. 1999) (unpublished) ........................................ 18, 24

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ............................................... 8, 25

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) ............................................... 8

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ............................................................. 9

**Federal Rules**

Fed. R. Evid. 702 ............................................................................................ passim

Fed. R. Evid. 801(d)(1)(C) ............................................................................................ 6

**Other Authorities**

35 Am. Jur. Proof of Facts 3d 1 ................................................................................. 22

*Modern Federal Jury Instructions*, Instr. 7-20. ........................................................ 24

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Abdi Yusuf Hassan's motion to introduce expert testimony regarding the reliability of eyewitness identifications.   At trial, the Government expects to elicit in-court identifications of Hassan from both Michael Scott Moore, the victim of the kidnapping at issue in this case, and a confidential source ("CS-1") who provided contemporaneous reporting about Moore's kidnapping to the Federal Bureau of Investigation ("FBI"), as well as to introduce Moore's identification of Hassan from a six-photo array.   As set forth in the affidavit of Dr. Nancy Franklin ("Franklin Aff."), Hassan intends to call Dr. Franklin to opine, in sum, on "the unreliability of Mr. Moore's identification of Mr. Hassan."   Franklin Aff. at ¶ 70.   Science does not support and the law does not permit the sort of expert testimony Hassan has proffered.   The very article described by Dr. Franklin as reflecting "current knowledge in the field," *id.* at ¶ 8, makes clear that there is "no evidence that the scientific research has reached the point that would properly permit an expert to opine, directly or through an equivalent hypothetical question, on the accuracy of an identification by an eyewitness in a specific case," Def. Ex. F at 159.   Not only does the state of scientific research not support the proffered testimony, but the law also precludes its admission, since an expert's claim, in essence, that another testifying witness is mistaken simply "intrudes too much on the traditional province of the jury to assess witness credibility."   *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir. 1999).   Moreover, as numerous courts have found, the type of testimony Hassan seeks to call Dr. Franklin to offer fails to satisfy the requirements of Rule 702 of the Federal Rules of Evidence.   "[T]estimony about factors affecting memory . . . are within . . . common knowledge," *United States v. Mohamed*, 157 F. Supp. 3d 268, 271 (E.D.N.Y. 2016) (internal citation omitted), and any concerns about the jury's treatment of eyewitness identification evidence

1

are best addressed through cross-examination of the identifying witness and proper instructions as to the law.  Accordingly, the Court should preclude Dr. Franklin's testimony, or, in the alternative, the Court should hold a *Daubert* hearing to determine whether Dr. Franklin's proffered testimony complies with Rule 702.

## BACKGROUND

Abdi Yusuf Hassan and Mohamed Tahlil Mohamed ("Tahlil") are charged in a seven-count Superseding Indictment (the "Indictment") with (1) providing material support for acts of terrorism, in violation of 18 U.S.C. § 2339A ("Count One"); (2) conspiring to provide material support for acts of terrorism, in violation of 18 U.S.C. § 2339A ("Count Two"); (3) hostage-taking and aiding and abetting hostage-taking, in violation of 18 U.S.C. §§ 1203 and 2 ("Count Three"); (4) hostage-taking conspiracy, in violation of 18 U.S.C. § 1203 ("Count Four"); (5) threatening to use a weapon of mass destruction against a U.S. national, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2332a and 2 ("Count Five"); (6) conspiracy to possess a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o) ("Count Six"); and (7) possession of a firearm in furtherance of a crime of violence, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2 ("Count Seven").

On August 5, 2019, Hassan moved to suppress any in-court identification "on the ground that any such identification was predicated upon improper pre-trial identification procedures." Dkt. 29 at 1.  The Government opposed the motion, and the Court reserved decision, noting that "[t]he issues raised regarding the identification will be addressed on the eve of trial."  Dkt. 41.

## I.   HASSAN'S ROLE IN THE HOSTAGE-TAKING CONSPIRACY

The Government expects to prove at trial that in January 2012, a group of Somali hostage-takers (the "Hostage Takers") abducted Michael Scott Moore ("Moore"), a journalist who travelled to Somalia to report on piracy, in Galkayo, Somalia.  The Hostage Takers held Moore captive for

2

nearly three years, before releasing him in September 2014 in exchange for the payment of a substantial ransom.

Hassan played an active role in Moore's captivity.  Specifically, during the final year of Moore's captivity, Hassan directed Moore to make phone calls and provide information for ongoing ransom negotiations, attended the production of a proof-of-life video with Moore, participated directly in negotiations for ransom payments, and served as an overall leader within the conspiracy, which used Hassan's home as a base of operations.

At trial, the Government expects to call as a witness CS-1, who, as described earlier, provided contemporaneous information to the FBI as part of the FBI's ongoing investigation of Moore's abduction and efforts to secure his return, including information about Hassan and his role in the conspiracy.  CS-1's family and clan connections provided him access to many of the Hostage Takers—including Hassan, with whom he shares a clan affiliation.  As a result, during multiple sustained interactions, CS-1 spoke regularly with Hassan and many of his co-conspirators while Moore was held hostage about the status of Moore's captivity, the locations where Moore was held, and the ransom negotiations being directed by Hassan and other co-conspirators.  CS-1 will testify that the Hostage Takers regularly used Hassan's house—which CS-1 frequently visited—for meetings and to store weapons, that Hassan's co-defendant Tahlil resided at Hassan's house for a substantial time during the charged conspiracies while working directly for Hassan, and that the Hostage Takers gathered at Hassan's home to chew khat (a local narcotic) and discuss the status of the conspiracies and the negotiations for Moore's release.

The Government further expects that CS-1 will testify to statements made by Hassan and other co-conspirators about their efforts to obtain a ransom payment for Moore's release.  In particular, CS-1 will testify about Hassan's role in a failed attempt to obtain a ransom payment

3

from an American interlocutor in the summer of 2014, an episode that, as described below, Hassan himself related to Moore during their interactions.  CS-1 will also testify about the discussions of the co-conspirators regarding the ransom payment that ultimately was made to secure Moore's release, including the fact that Hassan received a substantial portion of the funds, that other co-conspirators believed that Hassan may have cheated them by taking for himself a larger share of the ransom payment than they believed he was entitled to, and about a violent quarrel that ensued.

As part of its proof at trial, the Government also expects Moore to testify about his multiple sustained interactions with Hassan.  Specifically, Moore is expected to testify that he first met Hassan in approximately April 2014 at a safe house where Moore was being held captive.  During his initial debriefing with the FBI following his release, Moore described Hassan as ███████████ ████████████████████████████████████████████████████████████████████████████ ███████ Gov. Ex. A at 56, 59.[1]

Moore will testify that, unlike many of the Hostage Takers, Hassan spoke English and would provide the other Hostage Takers with khat and with news.  In addition, the Government expects Moore to testify about several conversations he had with Hassan over the ensuing months.

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

---

[1] The Government produced Gov. Ex. A, along with other FBI reports of interviews with Moore, to the defendants on March 10, 2020.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█  ███████████████████████████████████████████

██████████████████████████████████████████████

████████Moore is expected to describe each of these incidents in detail during his testimony.

## II.   MOORE'S REVIEW OF PHOTOGRAPHS OF HASSAN

Moore was released from captivity on September 23, 2014.  Over the course of nine days in early October 2014, the FBI conducted an initial debriefing with Moore regarding his time in captivity, resulting in a detailed 91-page report.  *See* Gov. Ex. A. ████████████████

██████████████████████████████████████████████

████████████████████████  ██████████  ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████  ██████████████████████████

███████████████████████  Def. Ex. A at 5.[2]

---

[2] ███████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████  Def. Ex. A at 6.

Over the next few years, through debriefings with CS-1 and other investigative steps, the FBI learned more about Hassan's participation in the kidnapping.  At no point during this period did FBI agents discuss Hassan with Moore or show him another picture of Hassan.  In or about January 2019, the FBI learned that Hassan would be travelling to the United States.  On or about January 25, 2019, the same day that Hassan was set to arrive, FBI agents conducted a video interview with Moore via Skype that began at approximately 8:30 a.m.  After being advised of the nature of the interview (but without in any way referring to Hassan), FBI Special Agent Thomas Miller e-mailed Moore, *see* Gov. Ex. B, a photo line-up of six numbered individuals at 8:34 a.m. Moore immediately identified photograph "3" as "a Somali pirate known as Hassan who was present while Moore was in captivity."  Def. Ex. D.  Moore then provided additional information about Hassan that was consistent with his statements concerning Hassan during the October 2014 debriefing, including the time frame during Moore's captivity when Hassan was present, Hassan's involvement in Moore's continued captivity, Hassan's apparent leadership role amongst the Hostage Takers, and his knowledge of English (which set him apart from nearly all of the other Hostage Takers).[3]  *Id.*

## III.    ADDITIONAL EVIDENCE OF HASSAN'S PARTICIPATION IN THE HOSTAGE-TAKING

The Government's proof of Hassan's role in Moore's captivity extends far beyond Moore's identification of the defendant.  As noted above, the Government expects to introduce testimony from CS-1 identifying Hassan in court, describing CS-1's relationship with Hassan, and relating CS-1's interactions with Hassan and other Hostage Takers during the kidnapping, including

---

[3] Evidence of Moore's identification of Hassan from this photo array is not hearsay, because Moore will "testif[y] and [be] subject to cross-examination about [the] prior statement, and the statement . . . identifies a person as someone [Moore] perceived earlier."  Fed. R. Evid. 801(d)(1)(C).

conversations about the status of Moore's captivity, the measures being taken to keep him captive, the locations where Moore was held, and the ransom negotiations. CS-1 will also testify that the Hostage Takers regularly used Hassan's home to store weapons, and that Hassan's home became a hub for the Hostage Takers, so much so that Tahlil resided at Hassan's house for a substantial time during the charged conspiracies.

In addition to CS-1's testimony, the Government expects to introduce the following evidence, among other things: (i) records showing Hassan travelling outside the United States consistent with the time period of his interactions with Moore; (ii) Hassan's Facebook communications with Tahlil in 2015, 2016, and 2017, demonstrating the two of them using familiar and endearing terms to greet each other; (iii) Hassan referring to one of the other Hostage Takers in his post-arrest interview as a "good friend of mine"; (iv) Hassan's Facebook and e-mail communications with other Hostage Takers; and (v) evidence regarding the meeting Hassan described to Moore involving an American named "J" attempting to secure Moore's release, as well as Hassan's claim to have discussed "J" with someone from the Interior Ministry for Galmudug, weeks after Hassan was appointed to the position of Minister of the Interior and Security.

## ARGUMENT

## I.   THE COURT SHOULD PRECLUDE THE TESTIMONY OF DR. FRANKLIN BECAUSE IT IS NOT PROPERLY THE SUBJECT OF EXPERT TESTIMONY.

### A.  Applicable Law

A trial court has broad discretion in determining the reliability and admissibility of expert testimony, *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), and the decision of whether to admit expert testimony will not be set aside unless "manifestly erroneous." *United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991).  A district court acts as the "gatekeeper" of expert

testimony, *Joiner*, 522 U.S. at 142, and must complete a two-part inquiry to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).  The party seeking to introduce expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations omitted).

In assessing whether the second prong of this test has been satisfied, the Court must determine whether the subject matter of the proposed testimony is technical, scientific, or otherwise concerns matters likely to be outside the common knowledge of the average juror.  *See Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (within broad discretion of district court to exclude expert testimony because jurors are "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training") (quotation omitted); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (same).

Expert testimony is not permitted "if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Lumpkin*, 192 F.3d at 289 (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (same).  By telling a fact finder what conclusion to reach, an expert "acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination." *Duncan*, 42 F.3d at 101.  As a result, the law "requires the exclusion of testimony which states a legal conclusion." *Id.*; *see also United States v. Jacques Dessange, Inc.*, 2000 WL 294849, at *2

(S.D.N.Y. Mar. 21, 2000) ("expert testimony that amounts to the statement of a legal conclusion must be excluded").

While recognizing the potential dangers inherent in eyewitness identifications, the Second Circuit has recognized the value of such testimony, stating in explicit terms: "we caution that much eyewitness identification is reliable and is, and should be, routinely accepted by juries." *Young v. Conway*, 698 F.3d 69, 80 (2d Cir. 2012); *see also United States v. Luis*, 835 F.2d 37, 42 (2d Cir. 1987) (finding no abuse of discretion in district court's refusal to give defense counsel's requested eyewitness identification charge in part because "[t]he [] circumstances provide strong indicia that the identification of [defendant] as a participant in the crime for which he was charged was reliable").

Eyewitness expert evidence is properly excluded in cases where the proposed testimony "basically consisted of general pronouncements about the lack of reliability of eyewitness identification" or contained "conclusions [that] coincided with common sense." *United States v. Serna*, 799 F.2d 842, 850 (2d Cir. 1986), *abrogated on other grounds, United States v. DiNapoli*, 8 F.3d 909, 914 n.5 (2d Cir. 1993) (*en banc*).  Indeed, Courts in this district confronted with similar circumstances have recognized that eyewitness expert testimony is inappropriate on this basis.  For example, in *United States v. Mohamed*, Judge Kuntz precluded a defense expert from testifying at a suppression hearing, finding:

> Should Dr. Cutler testify that the identification procedures used in this case were unduly suggestive, he would be inserting his opinion as to eyewitness credibility in place of the Court's. . . . Dr. Cutler's testimony about the "psychology of eyewitness identification"— testimony about factors affecting memory such as distance, exposure time, time overestimation, lighting, weapon focus, and head coverings, are within the common knowledge of the Court. The Court is more than competent to take into consideration memory-disrupting factors without the aid of an expert.

157 F. Supp. 3d 268, 271 (E.D.N.Y. 2016) (internal citation omitted).

9

Circuits nationwide have recognized that eyewitness identification experts may be excluded: (1) where such testimony is unnecessary (as it coincides with common sense notions about eyewitness identification); (2) because such testimony impermissibly comments on the credibility of witnesses; (3) because of Rule 403 considerations; (4) because the proffered testimony is not sufficiently tied to the facts of the case; or (5) because of a combination of these factors. *See, e.g.*, *United States v. Rodríguez-Berríos*, 573 F.3d 55, 70-72 (1st Cir. 2009) (testimony regarding lighting, lack of attention, and post-event information was properly excluded because cross-examination would test the reliability of identification); *United States v. Carter*, 410 F.3d 942, 949-51 (7th Cir. 2005) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses.") (quotation omitted); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("Given the powerful nature of expert testimony, coupled with its potential to mislead the jury, we cannot say that the district court erred" in precluding the testimony); *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. 1982) (testimony regarding eyewitness reliability inadmissible because jury capable of making credibility determination based on cross-examination); *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir. 1973) (reasoning that effective cross-examination is adequate to reveal deficiencies in identification).

Moreover, "[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to . . . any suggestibility in the identification procedure." *Manson v. Brathwaite*, 432 U.S. 98, 114 n.14 (1977) (internal citation omitted); *see also Daubert*, 509 U.S. at 596 (noting that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

*United States v. Ruggiero*, 824 F. Supp. 379, 396 (S.D.N.Y. 1993) ("[T]he reliability of the identification evidence can be ensured through the 'time-honored process of cross-examination'— 'the device best suited to determine the trustworthiness of testimonial evidence.'") (internal citation omitted).

### B.  Discussion

#### 1.  Dr. Franklin's Testimony Will Not Assist the Court With the Pretrial Question of Admissibility of Moore's Identification of Hassan

The Court is well-positioned to address Hassan's motion to suppress Moore's pretrial identification of Hassan, and testimony from Dr. Franklin will not aid that inquiry.  (*See* Dkt. Nos. 29, 41).  In determining the admissibility of Moore's pre-trial identification, the Court follows a two-step inquiry: determining first whether the pretrial identification procedures were "unduly suggestive" and, only if they were, whether the identification testimony is nevertheless admissible as "independently reliable."  *See, e.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2nd Cir. 1990).  These legal determinations are the domain of the Court.  *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (reversing conviction where the expert's highly prejudicial testimony included "repeated use of statutory and regulatory language" at issue and where his testimony was based on "his positive assessment of the trustworthiness and accuracy" of witness testimony); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (expert testimony that the use of force by the defendant constituted "deadly physical force" under the law and was not "justified under the circumstances" should have been excluded).  For substantially the same reasons as stated in *Mohamed*, the proffered testimony from Dr. Franklin would encroach the Court's fact-finding role in a pre-trial setting, because the Court is "'as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" 157 F. Supp. 3d at 271 (quoting *Salem*, 370 U.S. at 35).

Little of Dr. Franklin's purported expert testimony about the reliability of Moore's identification is relevant to the first question before the Court, namely whether "the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Salameh*, 152 F.3d 88, 125 (2d Cir. 1998) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991)). Because the defendant cannot show that the identification procedure was suggestive at this threshold level, the identification is "admissible without further inquiry into the reliability of the pretrial identification." *Maldonado-Rivera*, 922 F.2d at 973.

Only small parts of Dr. Franklin's affidavit address any suggestibility in the photo array procedure. Dr. Franklin opines that she "cannot at this point rule out the possibility of bias having been introduced and steering having taken place." Franklin Aff. at ¶ 52. Suggestibility is an issue for the Court to address based on pertinent legal authority, and it is not the Government's burden to rule out, nor Dr. Franklin's place to opine on, the hypothetical possibility that suggestion could have occurred. On the contrary, the defendant must "allege facts supporting his contention that the identification procedures used were impermissibly suggestive. A 'threshold showing' of suggestiveness is necessary in order to trigger a *Wade* hearing." *United States v. Berganza,* 2005 WL 372045, at *10 (S.D.N.Y. 2005); *see also* Dkt. 33 at 31-33 (Gov't Opp. to Hassan Mot. to Suppress, collecting cases).

As set forth in the Government's opposition to Hassan's motion to suppress identification evidence, Hassan has not presented adequate allegations to require a hearing, and Dr. Franklin has not helped him meet that burden. Despite Dr. Franklin's assertion that "[t]he fact that this procedure was conducted over skype and email would not have protected against influence by non-blind administrators," Franklin Aff. at ¶ 52, an assertion unsupported by any facts or any reasons

underlying that conclusion, common sense dictates that the procedure used substantially eliminated some of the traditional concerns about suggestibility. Because the process was conducted remotely, the agents administering the interview could not gesture towards a particular photo that was being viewed remotely on Moore's screen, nor could they observe which photo Moore was looking at to reinforce any tentative conclusion, in a way that might be possible were the law enforcement officers and the witness physically present together.

Dr. Franklin's only affirmative allegation with respect to the propriety of the identification procedure is inaccurate. She attests that "Mr. Moore was emailed the photo array from which he made this initial identification. Having this photo of Mr. Hassan in his possession would have afforded the opportunity to revisit it multiple times, inflating the risks further, of both artificially produced identifications and artificially produced certainty." Franklin Aff. at ¶ 61. But Dr. Franklin ignores the fact that the six-photo lineup was not emailed to Moore until "[a]fter the Skype video call was established," Def. Ex. D; *see also* Gov. Ex. B; and that he provided his identification immediately thereafter. In any event, Hassan and his counsel do not need an expert to press this factual claim.

Critically, at no point does Dr. Franklin opine that the photo array used in this case was itself suggestive. Hassan attempts to address this omission by asserting that the array was suggestive by claiming "that Mr. Hassan was literally 'framed' in the photo-array." (Mot. at 3.) Testimony from Dr. Franklin is not necessary to analyze, and reject, this overstatement. The Court has before it the actual array, Def. Ex. E, and can make its own assessment of whether a faint line in the backdrop of the defendant's photograph was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Simmons*, 923 F.2d at 950; *see also, e.g.*, *United States v. Shaffer*, 12 Cr. 430 (ARR), Dkt. 60 (order denying

motion to suppress pretrial identification as unduly suggestive, concluding that "[b]ased on the court's examination of the photos, the fact that Schaffer's photo is somewhat brighter does not render the array suggestive," and citing *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) (finding that array was not suggestive where defendant's photo was "slightly brighter and slightly more close-up than the others" but the photos were otherwise similar in appearance)).  Dr. Franklin did not identify this purported "framing" as a concern, and a simple viewing of the photo array demonstrates that it was a fair and reasonable presentation of six photos in a way that courts have universally upheld as an acceptable method of identification.  Dkt. 33 at 31 (collecting cases on propriety of six-photo identifications).[4]

In short, Dr. Franklin's affidavit adds nothing to the rank speculation that underlies Hassan's motion to suppress in the first place.  Her statements about the reliability of the identification—which reflect an opinion about a particular identification in a particular case which is unsupported by the state of her art—are immaterial to the threshold question the Court must resolve on its own, whether the procedure was unduly suggestive.  And the mere assertion that suggestiveness might be possible is not enough to merit a hearing, much less warrant the admission of largely irrelevant expert testimony at such a hearing.  As courts have widely recognized, despite the "difficulties defendants face in discovering whether improper procedures were followed in cases such as this where neither counsel nor their clients were present to view the interaction between the officers and the witnesses, . . . their suspicion of improprieties may be adequately

---

[4] It also bears noting that in questioning the integrity of the January 2019 identification, Hassan relies on a Second Circuit holding that a defendant was *not* "deprived of due process by the district court's exercise of its discretion in *not* holding a pretrial hearing on the issue of suggestiveness." *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984).

tested through cross-examination at trial." *United States v. Padilla*, 1994 WL 681812, at *8 (S.D.N.Y. 1994).

### 2.  Dr. Franklin's Testimony Is Inadmissible at Trial

Dr. Franklin's testimony at trial is inadmissible for at least three reasons: (1) most of it is irrelevant due to her failure to review critical factual details available to her that define the nature of the observations Moore made of Hassan, (2) it concerns matters well within the common knowledge of the jury which can be addressed through cross-examination, and (3) it substantially exceeds the permissible bounds of expert testimony.

### a.  Most of Dr. Franklin's Assessment Is Irrelevant Because Critical Information Was Withheld from Her

Dr. Franklin's affidavit purports to identify sixteen factors that are relevant to her assessment of the reliability of Moore's identification.  However, Dr. Franklin acknowledges that "the number and nature of interactions with the man alleged to be Mr. Hassan may have led to his face becoming truly familiar."  Franklin Aff. at ¶ 16.  The purported relevance of her conclusions is based on her underlying assumption that "[t]he number of observations by Mr. Moore of the man alleged to be Mr. Hassan are unknown, as are the circumstances of these observations."  *Id.* But this uncertainty is entirely manufactured, and these details are not only known, but have been disclosed to the defense.  The Government has already produced to defense counsel all of the FBI reports of interviews with Moore following his release, including a detailed 91-page report of his initial debriefing following his release from custody.  In that report, Moore described his extensive interactions with Hassan over the course of several months. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Indeed, the report details these and other interactions, as well as Moore's recalled timeframe for when they occurred.

But this vital information appears to have been withheld from Dr. Franklin in making her assessment. Although Dr. Franklin was provided with a variety of material from the case, it seems that she was not provided with the materials that detail the type and nature of Moore's interactions with Hassan. *See, e.g.*, Gov. Ex. A. For example, the report of Moore's initial debriefing details Moore's repeated, sustained interactions with Hassan, and Dr. Franklin's failure to address it renders the bulk of her analysis—premised on her hypothesis that "Mr. Moore's ultimate identification of Mr. Hassan may constitute an instance of stranger identification," Franklin Aff. at ¶ 16—suspect.

For example, Dr. Franklin offers the following expert opinion in footnote 1 of her affidavit:

> In this regard, the information I reviewed presents potentially conflicting accounts. The 302 detailing the photo procedure reports that Mr. Moore provided the following information: "[Hassan] was not present during the times the pirates moved [him], but may have been present during one of the proof of life videos that [he] made with the pirates in the bush." In contrast, the Government's opposition to the bail application states: "[T]he defendant directed Victim-1 to make several proof-of-life communications to send to Victim-1's mother and others in order secure a ransom payment … In or about July 2014, the defendant and other hostage-takers drove Victim-1 into the countryside surrounding Galkayo in order to take proof-of-life photographs." That is, Mr. Moore's first identification of Mr. Hassan was accompanied by allusion to a single event, with expressed uncertainty. The subsequent characterization includes

> embellishment both with regard to number of instances and details
> about them, following a pattern consistent with the suggestibility of
> memory.

Dr. Franklin also writes that "[t]he circumstances in which Mr. Moore encountered his captor

appear to have been far from optimal for forming a rich and lasting memory for the captor's face,"

Franklin Aff. at ¶ 70,

Dr. Franklin's suggestions of "embellishment" and sub-"optimal" identification

circumstances seem to ignore Moore's description of Hassan's role in at least two proof-of-life

calls and other ransom-related communications, as well as one video, as recited at length in the

report of Moore's initial debriefing and as summarized in part above.   What Dr. Franklin

characterizes as Moore's "initial identification" was not the first time that Moore had described

the defendant's role in his captivity.   Dr. Franklin lists three factors that comprise "optimal

circumstances" for face identification: extended viewing, close distance, and no stress, *id.* at ¶ 12,

and the report suggests that at least two of these three factors were present during the multiple

occasions during which Moore and Hassan interacted.

Because Moore had extensive interaction with Hassan, this simply is not a case of "stranger

identification," for which the various purported factors affecting memory during a brief interaction

would be relevant.   Under those circumstances, in which "Mr. Moore had indeed developed a clear

and lasting memory for his captor's face over multiple interactions," Franklin Aff. at ¶ 70, the only

question for the jury is whether Moore's initial failure to recognize a photograph of Hassan, when

presented as part of a collection of approximately 60 photos shown to him during a subsequent

debriefing after his release, gives reason to question his identification of Hassan from the photo

array in 2019.   An expert's opinion will not assist the finders of fact at trial in addressing that issue.

The jurors will undoubtedly be aware of the effect that the passage of time has on memory, and

defense counsel is certainly entitled to cross-examine Moore about the two circumstances in which

17

he viewed photographs of Hassan.  Juries and courts are "more than competent to take into consideration memory-disrupting factors without the aid of an expert."  *Mohamed*, 157 F. Supp. 3d at 271.

### b. The Affidavit Merely Recites Factors that Courts Have Recognized to be Within "Common Knowledge"

Even if the other factors cited by Dr. Franklin—which bear primarily on short-term "stranger identifications" quite different from the circumstances of this case—had some relevance, they still would not properly be the subjects of expert testimony because they simply reflect obvious facts well-known to average citizens.  Expert testimony should not be permitted when the factfinder is "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Salem*, 370 U.S. at 35. Indeed, "[a] district court may commit manifest error by admitting expert testimony where . . . the subject matter of the expert's testimony is not beyond the ken of the average juror."  *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).  No special expertise is necessary to comprehend Dr. Franklin's observation that "[h]ead coverings, sunglasses, and other items obstructing all or part of the face or head reduce ID accuracy," Franklin Aff. at ¶ 33, or that "weapons capture attention," *id.* at ¶ 26.

"Testimony about the 'psychology of eyewitness identification'—testimony about factors affecting memory such as distance, exposure time, time overestimation, lighting, weapon focus, and head coverings—are within the common knowledge of the Court," *Mohamed*, 157 F. Supp. 3d at 272, and the jury is no less capable of evaluating the testimony at trial. *See also, e.g.*, *United States v. Veal*, 182 F.3d 902 (2d Cir. 1999) (unpublished) (affirming exclusion of an "expert's proposed testimony that police officers are not superior eye witnesses and that a witness' confidence in making an identification does not correlate to its reliability" because the proffered

testimony "concerned matters of common sense within the province of the jury and could create confusion"); *United States v. Langan*, 263 F.3d 613, 623-25 (6th Cir. 2001) ("Although we recognize that expert testimony on eyewitness identification might inform the jury on all of the intricacies of perception, retention, and recall, we nevertheless agree with the district court that the hazards of eyewitness identification are within the ordinary knowledge of most lay jurors."); *United States v. Harris*, 995 F.2d 532, 534-35 (4th Cir. 1993) ("[J]urors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or 'inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination.").

The defendant's reliance on the Second Circuit's decision in *United States v. Nolan* is misplaced. *Nolan* concerned a claim of ineffective assistance of counsel presented in an appeal from the denial of a petition under 18 U.S.C. § 2255, where defense counsel "did virtually nothing to contest the admissibility" of four potentially problematic identifications arising from short-term interactions during the course of a robbery. *United States v. Nolan*, 956 F.3d 71, 76 (2d Cir. 2020). The Second Circuit found that each of these identifications contained "significant indicia of unreliability," noting that the perpetrators were "partially disguised," "[t]hey carried guns, on which the eyes of the victims were likely focused," "[i]nitially, the victims were unable to give investigators a detailed description of the robbers beyond noting that they were light-skinned or Hispanic" (even though Nolan was known to two of the victims), "[t]he four victims did not identify Nolan (who is white) as one of the intruders until they saw his photo in a photo array presented to them more than a month after the crime," one of the victims did not "firmly identify Nolan" until after another victim referred to Nolan's photo in her presence and said "that's him, right?" and after "law enforcement allowed that victim to view photos of Nolan on Facebook,"

and "[t]hat victim [then] discussed with two other victims her identification of Nolan and showed the other two victims his Facebook photo before these victims were asked to identify Nolan from a photo array." *Id.* at 75-77.  Meanwhile, the "evidence against Nolan beyond these eyewitness identifications was limited." *Id.* at 78.  The Second Circuit found that counsel rendered ineffective assistance for "fail[ing] to pursue a pre-trial motion to preclude the in-court identification testimony by the four victims," and "fail[ing] to hire an expert on eyewitness testimony or seek to introduce expert testimony about the unreliability of eyewitness identifications." *Id.* at 79.  In deciding the more limited question of counsel's effectiveness in failing to pursue these strategies, the Second Circuit had no occasion to decide the admissibility of such testimony under Rule 702, which must be evaluated under a different standard.

The circumstances regarding Moore's captivity—and his multiple sustained interactions with Hassan—are fundamentally dissimilar from the robbery described in *Nolan*, a hurried crime and only a fleeting encounter between the perpetrators and eyewitnesses during which the former were disguised in ways that complicated any reliable identification.  Despite two of the victims knowing the defendant beforehand, nearly all of the victims in *Nolan* were only able to identify the defendant as the perpetrator after the use of what the Second Circuit described as "highly irregular [identification] procedures" and grants of immunity.  *Id.* at 81.  None of those circumstances is present here.  Beyond mere speculation, Hassan has identified no infirmities or suggestiveness in Moore's January 2019 identification of Hassan, and neither Moore nor CS-1 will be testifying pursuant to a grant of immunity.  Moreover, unlike the victims in *Nolan,* even though Moore did not know Hassan before the kidnapping, he was able "to give investigators a detailed description of [Hassan]" in his initial debriefing in October 2014.  *Id.* at 75; Gov. Ex. A at 56-64. Indeed, as described above, Moore's identification is far from the only evidence in the case

inculpating Hassan.  The Second Circuit's decision in *Nolan* therefore has minimal applicability here.

### c.  The Affidavit Exceeds the Permissible Scope of Expert Testimony

It is beyond cavil that, whatever her qualifications, Dr. Franklin may not directly opine on the credibility of Moore's testimony, including his identification of Hassan as one of his captors. However scientific the purported basis for the assessment, "expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness' testimony.  The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." *Scop*, 846 F.2d at 142.  "[E]ven expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible." *Id.*  At most, "such witnesses may be permitted to testify to relevant physical or mental conditions." *Id.*  For this reason, the Second Circuit has long-recognized the impropriety of certain aspects of the testimony Dr. Franklin proposes to offer, such as her inappropriate opinion of "the unreliability of Mr. Moore's identification of Mr. Hassan."  Franklin Aff. at ¶ 70.  For example, with respect to the issue of "witness confidence" in an identification, in *United States v. Lumpkin*, the Court held that:

> Here, Dr. Lieppe's proposed testimony and explication of the scientific studies would have confused the jury's assessment of the officers' credibility.  Fundamental to the role of juror as trier of fact is the task of assessing witness credibility.  And, a witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility.  By testifying that confidence bears little or no relationship to accuracy in identifications, Dr. Lieppe would effectively have inserted his own view of the officers' credibility for that of the jurors, thereby usurping their role.  Indeed, by our estimation, the added aura of reliability that necessarily surrounds expert testimony would have placed the officers' credibility here in jeopardy.  As a result, we find Dr. Lieppe's proposed testimony

intrudes too much on the traditional province of the jury to assess
witness credibility.

192 F.3d at 289; *see also United States v. Hall*, 165 F.3d 1095, 1107-08 (7th Cir. 1999) ("[W]e
believe that the credibility of eyewitness testimony is generally not an appropriate subject matter
for expert testimony because it influences a critical function of the jury—determining the
credibility of witnesses."). Thus, even when expert testimony on certain aspects of eyewitness
identification has been permitted, "[n]o court has allowed the expert to express a specific opinion,
either directly or upon hypothetical question, regarding the specific identification made by a
particular witness." 35 Am. Jur. Proof of Facts 3d 1 (June 2020 update); *see also* Def. Ex. F at
159 ("[T]he committee has seen no evidence that the scientific research has reached the point that
would properly permit an expert to opine, directly or through an equivalent hypothetical question,
on the accuracy of an identification by an eyewitness in a specific case."). There is no basis either
in law or in scientific research for Dr. Franklin to reach her sworn conclusion that Moore's
identification is unreliable.

Moreover, significant parts of Dr. Franklin's affidavit would exceed other well-established
limits of expert testimony. For example, Dr. Franklin swears that, in her expert opinion, "Mr.
Moore's December 2014 rejection of Mr. Hassan carries even greater diagnostic value in favor of
Mr. Hassan's innocence," (Franklin Aff. at ¶ 56), which she purports to base on "computational
models describ[ing] the likelihood of innocence when a suspect is not identified," (Franklin Aff.
at ¶ 53). Such testimony would violate black-letter law that an expert "may not give testimony
stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. Dr. Franklin
is not a competent witness to proffer the claim that the defendant is *innocent* of the charges,
couched in the guise of her critique of an eyewitness identification, particularly in light of the other
evidence of Hassan's guilt that goes beyond mere eyewitness identification of which Dr. Franklin

is apparently unaware.  Even if Dr. Franklin were able to offer an opinion as to factors that could affect the reliability of identifications in general (recognizing that offering an opinion as to the reliability of Moore's identification itself would improperly tread on the jury's role), she certainly cannot offer an opinion as to the ultimate issue for the jury to decide, based on all the evidence in the case.

### d. Hassan Can Properly Address Identification Evidence Through Cross-Examination

While Moore's identification of Hassan as a leader among the Hostage Takers will undoubtedly be damning evidence of Hassan's guilt at trial, it is hardly the only evidence the Government will offer.  "Generally speaking, the existence of corroborating evidence undercuts the need, except in the most compelling cases, for expert testimony on eyewitness identifications." *Hall*, 165 F.3d at 1107-08.  The evidence corroborates Moore's identification in ways both large— such as CS-1's extensive account of his direct interactions with Hassan during the time of Moore's captivity—and small—like Hassan's travel records corresponding to the period Moore described Hassan as being present with the Hostage Takers.  The corroboration is both direct—Moore did not merely identify the photograph of Hassan as one of the Hostage Takers, he identified him by his true name as "Hassan"—and indirect—such as Hassan's extensive online interactions with other Hostage Takers, many of whom Moore has also identified.  In short, this case in no way "rest[s] solely on the . . . eyewitness testimony."  *United States v. Nickelous*, 916 F.3d 721, 724-25 (8th Cir. 2019).

The Government has no doubt that defense counsel will ably cross-examine the fact witnesses, including Moore, who will testify about the identification of Hassan, and that defense counsel's cross-examination will be well-informed by having consulted with Dr. Franklin.  That is precisely the mechanism on which courts can and should rely to elucidate for the jury any

reliability risks arising from pertinent eyewitness identifications.  Indeed, "much of what an expert would testify to can often be 'fleshed out adequately by counsel through probing cross-examination and arguments pitched to the common sense of the jury,'" *United States v. Burrous*, 934 F. Supp. 525, 527 (E.D.N.Y. 1996) (precluding testimony of eyewitness identification expert, quoting *United States v. Stevens*, 935 F.2d 1380, 1399-1400 (3rd Cir. 1991)); and "factors [such as] lighting, lack of attention, and post-event information are particularly susceptible to exposure through cross-examination without the benefit of expert testimony," *Rodriguez-Berrios*, 573 F.3d at 72.

In addition, "a thorough and evenly balanced jury charge, one that took into account some of Dr. [Franklin]'s concerns, would be the most effective means of guiding the jury in its evaluation of [the identification] testimony."  *Burrous*, 934 F. Supp. at 527; *see also Veal*, 182 F.3d 902 (observing that district courts "may properly address the dangers of unreliable eyewitness identification testimony by giving a jury charge appropriate to the circumstances of the case"). While the defendant's proposed instruction on eyewitness identification is inappropriate, being drawn from New York State law and premised on the incorrect assumption that only one witness will identify Hassan as a perpetrator, the Government does not object to the inclusion of a charge to the jury on eyewitness identifications.  This Court gave such a charge in *United States v. Shaffer*, 12 Cr. 430 (ARR), Dkt. 77 at 14, which directly tracks the well-respected standard charge contained in *Modern Federal Jury Instructions*, Instr. 7-20.  To the extent that there are particular modifications to that charge that are appropriate in light of the testimony at trial, the parties and the Court will undoubtedly be able to craft an instruction that ensures that the jury is properly charged on their role in assessing the credibility of identification evidence, just as it is their role to assess the credibility of all evidence presented at trial.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD HOLD A *DAUBERT* HEARING

For the reasons set forth above, there is ample basis for the Court to conclude that the defendant's motion does not meet his "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *Williams*, 506 F.3d at 160.  Because expert testimony on the reliability of eyewitness identifications does not meet *Daubert*'s requirement that it "will assist the trier of fact to understand or determine a fact in issue," *Daubert*, 509 U.S. at 592, the Court can reject Dr. Franklin's testimony as inadmissible on that basis alone. In the alternative, however, before admitting Dr. Franklin's testimony—either at a pretrial hearing on the admissibility of identification evidence or at trial—the Court should hold a *Daubert* hearing to address whether Dr. Franklin's testimony also satisfies the reliability prong of the inquiry under Rule 702.

In particular, there is significant reason to question whether Dr. Franklin's methods and conclusions are reliable.  Among the factors incorporated in that prong of the analysis are "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593-94).  As part of that inquiry, the Court must determine not only the reliability of a general field of study, but also whether the expert's conclusions are properly drawn from the scientific principles at issue.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.  Instead, the gatekeeping function requires the Court to consider "how the expert applies the facts and methods to the case

25

at hand," *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002), and to "examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used," *Heller v. Shaw Indus., Inc*., 167 F.3d 146, 153 (3d Cir. 1999).

As noted above, there is substantial reason to question whether Dr. Franklin's methods are reliable. Most notably, Dr. Franklin's willingness to opine directly on the reliability of Moore's identification of Hassan, *see* Franklin Aff. at ¶ 70, is in direct contradiction of the primary scientific article that she attached to her affidavit. Dr. Franklin reached that conclusion even though there is "no evidence that the scientific research has reached the point that would properly permit an expert to opine, directly or through an equivalent hypothetical question, on the accuracy of an identification by an eyewitness in a specific case." Def. Ex. F at 159. Such an explicit departure from what Dr. Franklin apparently views as an authoritative guide to best practices should give the Court great pause in concluding that her testimony reliably adheres to proper scientific practices.

Similarly, as described above, Dr. Franklin apparently did not incorporate in her analysis critical information that was available to the defense about the circumstances of Moore's interactions with Hassan. To the extent that Dr. Franklin did not ask for any available information about those critical facts, to supplement the selected materials provided to her by defense counsel, *see* Franklin Aff. at ¶ 5, that too raises substantial questions about whether her analysis comports with the best practices of the scientific method to which she intends to testify, or is instead simply the sort of unreliable *ipse dixit* that the Supreme Court has warned should be rejected.

Finally, the bulk of Dr. Franklin's conclusions are not in fact conclusions, but merely asserted possibilities. *See, e.g.*, Franklin Aff. at ¶ 19 ("some of Mr. Moore's alleged encounters with Mr. Hassan *may have* been task-oriented"; ¶ 24 ("Mr. Moore experienced violence and threats

26

repeatedly during his captivity, which *may have* included the period of time over which he allegedly encountered Mr. Hassan"); ¶ 34 (describing possible results "*[i]f* the man alleged to be Mr. Hassan wore sunglasses and/or head coverings during his encounters with Mr. Moore") (all emphasis added).   Other aspects of Dr. Franklin's conclusions are speculative, such as the unsupported claim, derived from no material provided to Dr. Franklin, that Mr. Moore may have obtained other "photos or videos of Mr. Hassan," *id.* ¶ 42.   These qualified assertions do not "reliably follow from the facts known to the expert," *Heller*, 167 F.3d at 153, but are instead merely an invitation for the jury to speculate that such matters might have happened.   They are in no way the reliable product of the application of scientific expertise to the facts at hand.

These infirmities are not cured by Dr. Franklin's qualifying assertion that as more information is available, her "recommendations regarding the specific factors relevant to eyewitness memory will be clarified accordingly."  Franklin Aff. at ¶ 5.  Dr. Franklin appears to have failed to request or review a large quantity of material already available to the defense that bears on the issues about which she seeks to opine.  Her attempt to reserve the right to modify, *ad infinitum*, the conclusions of her expert affidavit renders her testimony an impermissible moving target for the Government to address.  The Court set a deadline for expert disclosures in this case of February 10, 2020.  The defendant was certainly on notice of the Government's intention to introduce identification evidence, given that Hassan moved to suppress it in 2019.  In light of the adjournment of the trial date, the untimeliness of Hassan's disclosure is perhaps less relevant, but it does not relieve Hassan of his obligation under Rules 702, 703 and 705 of the Federal Rules of Evidence to promptly disclose a written summary of the testimony that the defendant intends to use as evidence. Dr. Franklin's claim that she may revise her opinion at any time, for any reason, deprives the Government of the ability to consult with experts in the subject matter area of the

27

expert testimony to be offered by the defendant and to "insure effective cross-examination, prevent surprise and avoid delay." *United States v. Gerena*, 116 F.R.D. 596, 598 (D. Conn. 1987); *see also United States v. Mahaffy*, 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) ("It is well-settled that a court may in its discretion preclude expert examination pursuant to Rule 16(d)(2)(C) of the Federal Rules of Criminal Procedure regarding any topics or opinions not properly disclosed."). It would be impossible for the Court to conduct the *Daubert* gatekeeping function to assess "how the expert applies the facts and methods to the case at hand," *Amorgianos*, 303 F.3d at 266, when how the expert does so is subject to constant modification.[5]

Thus, to the extent that the Court does not preclude Dr. Franklin's testimony, the Court should, in the alternative, set a deadline for the production of a final, unqualified expert report from Dr. Franklin that states her actual opinions and the bases for them, and schedule a *Daubert* hearing.[6]

---

[5] Indeed, if the Court decides to permit any part of Dr. Franklin's testimony, the Government must, in an abundance of caution, similarly request the Court's permission to file additional motions addressing any such "clarifications" to Dr. Franklin's movable conclusions.

[6] While the timing of such a hearing is obviously contingent on the lifting of the current COVID-19 related restrictions and the reopening of Court facilities for in-person proceedings, the Government would request that the hearing be scheduled sufficiently after the production of a final expert report to allow the Government to retain and consult with its own expert, who would then also serve as a Government rebuttal witness if any portion of Dr. Franklin's testimony is admitted.

28

**CONCLUSION**

For the foregoing reasons, this Court should deny the defendant's motion to admit expert testimony on the reliability of eyewitness identification, or should, in the alternative, hold a *Daubert* hearing.

Dated: June 11, 2020
  Brooklyn, New York

         Respectfully submitted,

         RICHARD P. DONOGHUE
         United States Attorney for the
         Eastern District of New York

By:   /s/
         David W. Denton, Jr.
         Sam Adelsberg
         Special Assistant United States Attorneys
         212-637-2744/2494